Thank Your Honor. Jim Dizno, Professor Ochoa. I'm going to take the first 20 minutes. I'm going to ask for two for rebuttal. Hopefully I'll remember. And then Mr. Walsh, my co-counsel, will go for 10 minutes. All right. Thank you, Your Honor. I'm going to start talking about Argument 1, which is the mitigation claim. And may it please the Court, I'd like to imagine for a minute that I'm a social worker. I was born in 1970, and I'm invited into a situation where I see a house where my father's now gone. He gets up late. He doesn't work. He drinks a case of beer a day. He did two terms in the same prison. His probation officer brought him in. And the person he's married to is the mother. She's passive. She works across town as a cocktail waitress. She's an alcoholic. She's come from a family of alcoholics. And with major mental illnesses, going back to the book of No Limits. And the mother and the father have terrible screaming problems, especially when the father is drunk. He repeatedly beats up the mother. He takes her money and tries to close her business. There's four children living in the house in 1970. Bonnie, the clock hasn't started yet. Sorry for interrupting, but the clock is still showing 20. There we go. Okay. You got a bonus minute. Yeah, like the final four. But just to continue setting the stage here, the father, there's four kids in the house. The father is repeatedly throwing the stepson, the product of the wife's previous marriage. She was married at 16 years old. The stepson, he throws against the wall. He belittles him. He's repeatedly raped the stepdaughter from age six to 16, a whole decade of rape. The stepdaughter, in turn, has raped the natural daughter. And the young son, and let's call him Lester as witness. He has a low IQ. He has cognitive difficulties. And the daughter, Sharon, described growing up as a small child this way. She's maybe five years old. Lester and I would go into our rooms and try to sleep. And, of course, it was impossible, all the yelling and fighting. Sometimes we would get so scared that we'd run to a neighbor's house and call the police. I remember the police coming to our house many times to break up fights between my parents. But looking at that situation, if I was a social worker, I would say, you know, it's time for the government to intercede here. Something is going on. Lester is at risk. And I think that any reasonable social worker would say that. And similarly, when you think about the so-called fair-minded judge, and, of course, this case really is about a fair-minded judge because of the Richter v. Harrington, the federal judge has to, or the state court has to, he just said he denied it. He hasn't entered a reasoned opinion. The federal judge has to say, well, let me think what the state court would have said if they wrote an opinion. And then ask myself, is it fair-minded? And what I want to say, Your Honors, is that no fair-minded jurist would think that California didn't make a clearly, objectively unreasonable decision when they failed to play straight. Because this case cries out for the evidence developed in the habeas theory, which humanized Lester Ochoa. There would be jurors on the, if we had a trial of the habeas evidence, there would be jurors who would be saying to themselves, you know, that sounds, I think something like that might have happened to me or my family or my loved ones. That was a traumatic experience. Why wouldn't you say that the case that was presented, I think it may well have been more aimed at humanizing Mr. Ochoa by demonstrating that he was not irretrievably lost, that even within prison he was capable of doing good things. He could serve other people, even if he's going to be in prison for the rest of his life, as distinguished from a case that says, this man has had such a horrible background, he's lost. He's not going to be retrieved. What's the point of maintaining that life? Well, there's a couple of things there, Judge Lifton. First of all, the penalty face that was presented was a complete lie. They said a good childhood gone wrong by drugs. They never explained why he had the drugs. Of course, the explanation, now we know why. It's because he had a terrible childhood, and he suffered trauma during that childhood. There was no one there for Lester when he wanted to know how to grow up to be a good person. He wanted to grow to a full-fledged person. Who's there to instruct him? His father who's grown, who's beating up the mother? Mother who says nothing? His stepdaughter who's being raped? He's there for, he's got no one to help him. My concern is that, sorry, go ahead. No, go ahead. Well, my concern is you're simply tossing fuel onto the fire that was the source of my concern, because all this evidence you're talking about is evidence that would seem to support a concern that this man is gone, as distinguished from an argument that tries to say there is still hope for this person, and even though he will be incarcerated for the rest of his life, he can do some good. Now, I'm not saying it is a slam-dunk decision for one theory over another, but it's not clear to me either why defense counsel's decision to go for the hopeful route rather than the lost route wasn't a reasonably professional decision, or why you can say a different outcome was reasonably probable if the argument being made to the jury is that this man is lost. He's been too broken in his childhood. Your Honor, with all due respect, that's just not a fair-minded conclusion here. That's Hollywood. The Bad Seed, 1960 movie. Badger, Bone Killer, 1984 movie. That's not what this case is about. This case is about science. This case is about how a jury would see that because of his troubled childhood, his choices were restricted. The jurors would recognize, as they didn't recognize in this multiple jury, that there is a situation which I could have gotten through. That shows the fragility of human experience. It humanizes it. The jurors have no explanation as to why he chose drugs. This great guy, why did he go off and choose drugs and then do this horrible thing? Lacey Chandler, they have no explanation. So I would disagree. I think that the penalty faced that our hate is invested in here, by the way, his name is Harold Husch. He's a great patient specialist. It's 100 times better. It's a great penalty faced because the jurors can see themselves in the things that happen to lesser inmates. It's more human, not less human. The idea that he's irreparably damaged, he suffered permanent damage, to me that's a Hollywood. That's just a straw man. That's what the movies say. That's really what science says. Science says a bad childhood can lead to bad results. Childhood experiences. And vice versa. Some people are raised in horrific circumstances and end up being outstanding citizens. So it's not necessarily true that because you are raised in horrific circumstances, you are doomed to be a criminal. That's also a Hollywood fable that a lot of people are victimized by. What I wanted to ask you was, was he presented as having a good childhood or being a good guy? No, a good childhood. Where in the record can we look to ascertain that his childhood was focused on as being a good one? Where is that in the record? Well, the testimony of his sisters, his two sisters who testified, they said he had everything he wanted. And the prosecutor in closing argument said he's had a great childhood. But, in fact, just as in the cases of Sears v. Uplift and the new case of Honders v. Texas, it was falsely presented. Rollins said, I just want to say that it's true that there's people who have had nothing and come from nothing. But, on the whole, people who have childhood experiences that are bad have bad results. They have less choice. I don't know that that's true because there are a number of people. That's a stereotype, I think, and one that we should reject, perhaps, because that's not true. There are a lot of people who come from horrendous circumstances who end up being model citizens. I think it's equally misrepresentative to doom people to being the worst of the worst just because they had a bad beginning in their childhood. It's not doomed, Your Honor. You're talking about percentages. Lester Ochoa, I mean, I've known him for 20 years. He's not going to be a judge. He's not going to be a scientist. His best possible outcome, given his upbringing and his IQ, was not great. Now, it wasn't going to be, it shouldn't have been, to be a murderer. But, then again, we're not asking for him to be let free. What mitigation does is it asks the jurors, look at this guy. Isn't this something that can happen to you? Weren't his choices curtailed? Didn't he, because he was a nice guy, he loved his family, he liked to play golf and he liked to dance, he made the best of a terrible situation. They can humanize him and give him life after all. That's what mitigation is about. Mitigation is about the jurors seeing something of the defendant in them, saying to themselves, you know, maybe this guy didn't have a chance. The prosecutor's argument here, as it is in every criminal, in every death penalty case I've ever seen, is he chose to do this. He chose to inflict the harm. And what mitigation does is mitigation says, yes, he chose it, but he also was put in a life from the very beginning that he didn't choose. And you can sympathize with that. And you can give effect to that by finding, yes, he can go away for the rest of his life. He's getting life without parole, but you don't have to give him the death penalty. But that begs the question that Judge Clifton had. Is that the only way he could be presented, or did the attorney reasonably decide that I'm going to present him as a good guy, not a bad apple, so that perhaps people can say this is a good guy who just took a wrong turn at some point? Well, Judge Frolickson, that goes to what Wiggins versus Smith said. You know, a defense attorney can make any strategic choice he wants, but it's got to be based on a reasonable investigation. Let's suppose I'm the defense attorney. I call in the sister and the step-sister and the mother into my office, and I go, didn't nobody abuse you? There was no domestic violence. There was no sexual violence in your house when Lester was growing up. Isn't that right? And they all go, yeah, yeah, yeah, because they all don't say things like that. That's why you have the mitigation investigator. There was no reasonable investigation to allow the trial counsel to make a strategic choice. What does the record tell us about what investigation was conducted? Where in the record can we look to ascertain the investigation that was done by defense counsel? All I can tell you, Your Honor, is that the proof is in the pudding. Well, but I'm asking you from the record, because the only way we can tell whether or not the investigation was reasonable is to know what the investigation was. So that's why I'm asking you, where in the record can we look to determine what the investigation actually was? Look at what the witnesses told the habeas investigator. They never ask me those questions. The mother says they interviewed me, and the only time I was interviewed was with the father was right there. The sister says... If you look at those declarations, like the sister, Arlene, she says that Jimmy treated him differently. She said, I saw Lester as well as Sharon as spoiled, because Jimmy treated them differently than he treated Connie and Connie. So even assuming there should have been investigation of what happened to the other family members in the house, you... I mean, this is a case where this defendant is himself subject to horrific levels of abuse that some of the other people in the household are. In that circumstance, is it reasonable for the California courts to conclude that getting into this for secondary abuse or, you know, environmental evidence would not have made a difference given the factors that were emphasized in the trial? Okay, well, there's a couple things there, Judge Collins. First of all, this sister wasn't... The step-sister was not properly interviewed. Yes, she says that he was favored, but no, she never told how she was sexually abused by the father for 10 years. But my point is that in a case where he isn't the one being abused, is it reasonable to conclude this kind of second-order level of abuse to others in the family and the surrounding chaos is not a strong and mitigating factor, and therefore it's reasonable to conclude that it didn't make a difference even if it should have been known by the defense counsel. Well, that's what I was trying to get at with my first little statement of the fact. A reasonable social worker would want to get Lester out of that environment because science tells us that even though you're not the direct target, growing up in that atmosphere is going to have adverse consequences. And that's what our psychologists said. The pervasive presence of mental illness, substance abuse, and violence permeated Lester Ochoa's early years and provided a toxic environment for him that directly contributed to his actions. So what I would say, Judge Collins, is yes, you're correct that our habeas does not show he's the direct target, but nevertheless he is directly affected, and any reasonable person would want him out of that situation. It's a situation where he has nowhere to turn. It's going to have adverse consequences, and jurors can see that. Jurors can say, you know, that poor Lester, he's sitting there at 10 years old, he's hearing his parents scream every night. He's hearing the sounds of his father hitting his mother. No, the father, we don't show that there was some interest. Maybe the sister said that he might have been hit once or twice or something. But no, the violence was mainly, or at least we've proved that it was directed at others, but it affects him just as much. And jurors can see that, and jurors can give that mitigation. Mitigation doesn't mean that they're going to let him off. Mitigation is just to say, this guy never had a real fighting chance, and because of that, we're going to exercise our discretion and our knowledge of human frailty and give you life without parole, and not death. Now, another thing that I wanted to say, and no one has asked me, but I've known that the electronic brought this up, what were the red flags? There were red flags here for the trial counsel to see this, and the main red flag was, Jimmy and Joe had a prison record. But this record is easily available. You get the court records. That leads you to the prison records. That leads you to the probation report. And once you see the immature psychopath has a red flag, has been to prison twice, it's like, well, did that happen on my client? Another thing that the government brought up that the court has not asked me is that, how come Mr. Ochoa never told him that? And, again, if I have Mr. Ochoa and I go to see him in the jail and I say, well, isn't it true your father was a rapist or your father was a domestic violence and your mother was an alcoholic? He's not going to say that, that if they weren't just as Mr. Rapilla in Rapilla v. Byrd and Porter and Porter v. McCulloch, they didn't see. They told the trial counsel they had a great childhood. But it wasn't true. And the Supreme Court in both cases reversed for ineffective decisions. No fair-minded judge would say that California shouldn't have applied strictly here. And I would reserve the rest of my time. All right. Thank you, counsel. Mr. Walsh? Yes. Joseph Walsh. I've reserved ten minutes for argument four in the brief, which is the defendant was prevented from arguing and having the jury instructed on family sympathy as a mitigating factor during his penalty trial. The ruling in the California Supreme Court in affirming the death penalty in this case we believe is an unreasonable application of federal law, namely under Lockett v. Ohio, Eddings v. Oklahoma, and Skipper v. North Carolina. And we believe that the failure of the Supreme Court to follow those instructions and the exclusion of family sympathy evidence as a mitigating factor warranted habeas relief because the defendant suffered prejudice. Now, the facts that developed this claim were that at the penalty trial, the defendant requested a jury instruction that family sympathy or sympathy for the defendant's family is a mitigating factor, and the trial court denied it and strictly struck it out of the jury instruction and said they could only consider sympathy for the defendant, not for the defendant's family. And he ruled that that was not a mitigating factor. And then during the closing argument. Let me interrupt you for a second and start with that. Is there a Supreme Court precedent that says that it was a denial of Mr. Ochoa's constitutional rights not to give the instruction that was requested and denied by the trial court? Well, we're relying. I think the closest case is Skipper v. North Carolina. And in Skipper was the case where the trial court would not allow the defendant to put on two jailers and a visitor of the defendant in the jail while he was awaiting trial to prove that he had adjusted peacefully to life as a prisoner. And the Skipper v. I've got to say that doesn't sound very close to me. Not only does it not have to do with instructions, but it has to do with the conduct of the individual petitioner defendant. I guess at that stage he would have been defended. Is that the closest there is to support? And I understand your argument goes beyond the failure to give the instruction, but I want to stop there because I really think that argument is a tough one to make based on Supreme Court precedent. And that's why I want to know what's the closest precedent. It sounds like it's Skipper. Skipper doesn't seem very close. Well, Skipper did establish the rule. The rule is the rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence. That was rule two in Skipper. And then they went on to define what mitigating evidence. But you're not talking about the denial of any evidence. You're talking about an instruction. So I'm not sure a Supreme Court rule saying you can't keep evidence away from the jury is going to provide much help here because there is no evidence that's kept from the jury that I understand your argument identifies. It's about an instruction as to whether this additional factor can be considered. Well, it's about I think the trial court's ruling was that family sympathy is not a mitigating factor. And the fact that he wouldn't instruct on that meant that it was the defendant was barred from using that as a mitigating factor. There wasn't a special instruction on it, but the California Supreme Court said that there also was an instruction that said mitigating factors are unlimited. Anything mitigating should be considered. The gating factors provided in the instructions are merely examples. So how is there how is the refusal to include the special instruction or prohibition on it? Well, the answer is that the trial court made a ruling as a matter of law that family mitigation cannot be used as a mitigating factor during the trial. And impliedly... Was that prohibition embodied in the jury instructions though? The California Supreme Court seemed to say no to that. Except that the district attorney in his closing argument in the penalty phase specifically told the jury and directed them that you cannot consider family sympathy you can only consider sympathy for the defendant. So the district attorney was driving home what the trial court had ruled outside the presence of the jury. That family sympathy is not a mitigating factor. The district attorney in final argument drove it home and emphasized it. And defense counsel was not able to rebut it during the penalty trial resulting in the complete removal of that particular mitigating factor. And I think that the Skipper case, although it's not a jury instruction case, it's a mitigating factor case. And it says that the courts cannot... That once you've identified something as a mitigating factor, the courts cannot constitutionally prevent the jury from considering it. Whether... Considering it in any fashion. Whether by jury instruction or closing arguments. And that's what happened here. And Skipper went on to define what a mitigating factor is. And a mitigating factor is any evidence that serves as a basis for a sentence less than death. And in our case, family sympathy clearly is evidence that serves as a basis for a sentence less than death. Even the California Supreme Court recognized that family sympathy can reflect the good character of the defendant because if the jury sees that he has family members that love him and that would suffer if he were executed, that reflects positively on the defendant. That maybe he's a person whose life is not something that should be thrown away by a sentence or a verdict of death. That testimony focused on the defendant himself. Is there anything that supports the proposition that mitigation extends to consideration for the defendant, somebody other than the defendant? In this case, the defendant's family. Well, there's no case that precisely parses that particular fact. I'm not sure how much parsing there is. I mean, it either is the defendant or it's somebody else. And as you know, we're required to look to the federal laws established by decisions of the Supreme Court. Is there any Supreme Court decision that would help us get to mitigation in consideration of anything other than the defendant himself? In this case, the family. Well, there is the case of Cullen v. Pinholzer, which is 2011, in which the United States Supreme Court, in denying habeas, said that all of this other mitigation that was offered, that the habeas counsel said should have been presented, the court said it was unnecessary for that to be presented because counsel in the trial court made a reasonable determination to raise a family sentencing mitigation. And the court states in Cullen v. Pinholzer, family sympathy mitigation defense was known to the defense bar in California at the time and has been used by other attorneys. And in the Cullen v. Pinholzer case, the only mitigation witness that was offered in the penalty phase was the defendant's mother. And habeas counsel developed additional family members that could have testified, additional psychiatric testimony that he was suffering from bipolar disorder. But the court ruled it no. It was a strategic choice for the defendant in that case to go on the family sympathy type of mitigation. So the Supreme Court of the United States has recognized that family sympathy is a mitigating factor. And so we go back to the cases of, well, there was one other case that dealt with jury instructions. It was, although it wasn't specifically a jury instruction case, Eddings v. Oklahoma, where the trial court refused to consider the violent childhood of the defendant. And the United States Supreme Court said that this case is like a judge instructing the jury to disregard mitigating evidence. And so in Eddings v. Oklahoma, the court kind of refers to the fact that the ways in which mitigation is excluded unconstitutionally is through jury instructions, telling the jury not to consider the mitigation or through rulings by the trial court to exclude evidence of mitigation. In our case, the evidence of family sympathy was presented and it was in the record, but counsel was barred from arguing it during closing arguments and was denied the right to have the jury focus on this particular mitigating factor. And the fact that there was this catch-all mitigation jury instruction that said you can consider any factor in mitigation of the penalty, the jury was given that. But trial counsel was specifically told that they cannot consider family sympathy. And so he was denied the right to present that and in his closing arguments, and he was denied the right to have a jury instruction which narrowly focused the jury on family sympathy. And the final reason why the ruling shows unfairness is Payne v. Tennessee is the case that says the prosecution can present victim impact testimony in support of the death penalty. That's where the victim's family comes in and testifies how horrible their lives have been since the defendant had killed their family member. And family sympathy on behalf of the defendant is the only way to rebut this and counterbalance this victim impact evidence which is authorized in death penalty cases under Payne v. Tennessee. And then the last issue is whether the defendant has suffered prejudice. And I would point out that there's no – the California Supreme Court only decided that family mitigation – family sympathy is not a mitigating factor. It never decided prejudice. So I think we're in a case where there's no deference to be regarded to the decision on prejudice under 2254D. And the court would have to review the prejudice under De Novo standard, which would be the standard of Brecht v. Abrahamson, which the court has to make a determination whether there's a substantial and injurious effect on the verdict. And essentially Wiggins v. Smith says what the court has to do is to reweigh the aggravating and mitigating circumstance and decide whether there's a reasonable possibility at least one juror would vote for life because the death penalty verdict has to be unanimous. And here we have family sympathy witnesses, the mother, the wife, two sisters, the sister-in-law. And then in order to highlight the prejudice, we have the evidence that the district attorney argued that you cannot consider sympathy, which compares to the fact that Skipper v. North Carolina in the Skipper case, they tried to present evidence that he would adjust peacefully to jail and he wouldn't harm other inmates. It was excluded. And then in the final argument, the district attorney in Skipper argued that the defendant should be executed because if he went to jail, there's a reasonable likelihood that he would rape other inmates in jail. And that was part of the trial in the Skipper case when they found prejudice. The court held that it was air to exclude evidence that he would adjust well in the jail. And it was prejudicial because the district attorney made the argument against that. He said there's no evidence that he would adjust. And the defendant in that case was convicted of a rape murder. And so the district attorney argued put him to death because there's future dangerousness here and he would likely commit rape. All right, counsel, you've exceeded your time. We'll hear from the government. Good afternoon, Your Honor. Stephanie Santoro for the state. I'd like to first begin by addressing claims 19 and 21, the ineffective assistance of counsel. The California Supreme Court recently concluded that counsel was first reasonable in this investigation. They interviewed several family members, including the petitioner's wife, two sisters, a childhood friend, and they all uniformly made the same point. They all uniformly. You're fading out, counsel, so if you could adjust your microphone or something so that we can hear you better. Is that better, Your Honor? A little. Can you hear me OK now? Yes, that's much better. Maybe you should sit closer. We'll do. Could you start over telling us, you said he interviewed several family members, friends, and then what else did you say? He interviewed several family members, which included petitioner's wife, his two sisters, a close childhood friend, and they all painted the same portrait of petitioner, which counsel also acknowledges, which is that petitioner himself had a relatively decent childhood, that it was only that he turned to drugs when things began to go downhill. To me, those questions go more to prejudice, because the declarations do say that I was not asked questions about, you know, what abuse happened to me, what was going on in the house. Is there any evidence to the record to say that defense counsel was aware of all of this chaos? Well, no, the problem is the record is silent on this point. You're freaking out. The record was silent on this point, and the problem is petitioner bears the burden of establishing what... I don't think it's silent, because if you have a declaration that says I was interviewed and no one asked about the topic,  I don't see how that's silent. I'm sorry, one minute. The court clerk is instructing me to use a headset. Let me see if I can find one. Can you hold on, Your Honor? Okay. If you can't find a headset, if you would just lean closer into the mic, I think we can hear you. It's when you lean away that we cannot hear you at all. Okay. I'm sorry. I cannot find a headset. I only have a wireless, but that won't be compatible. Is this okay? Yeah, but you have to stay close to the mic, otherwise you fade away. Okay. In response to your question, Judge Collins, about the record, I'm sorry, could you repeat that, please? My question was you said that the record is silent, but I don't know that it's silent. It did produce declarations from people who said back then I was interviewed by a defense investigator, and they didn't ask me about this, and they didn't find out about this, and so it's not silent. It seems that that shows that they didn't get this information, so I'm not sure we have a basis or reasonable basis to say that there was a strategic judgment to present one versus the other when they didn't have all the information. Well, first, the problem is even if counsel did not ask those questions, he interviewed, by my count, at least four to five people who grew up in the same household as Petitioner, and they all said the same thing. This is not a situation where perhaps maybe one stepsister said, well, you know, actually, Petitioner suffered X, Y, and Z. They all said the same thing, so there simply was no red flag or no reason for a competent attorney to dig further. Now, I'd also like to note that under prejudice, the witnesses that testified at trial, their post-conviction declarations essentially paint, they supplement the portrait even to the jury at trial. So that is in addition to saying that Petitioner had a good childhood, they now say that they suffered abuse, but there are no allegations that Petitioner himself suffered direct abuse. Under these circumstances, even with the new evidence, when compared to the incredibly heinous nature of the crimes and the other aggravated evidence presented by the prosecution, it is simply not reasonably probable that a jury would have spared Petitioner's life even with this new evidence. I would also like to note that Wiggins, the Supreme Court case is distinguishable because there were red flags that defense counsel unreasonably ignored, and it was on that basis that the court found deficiency. Here, Petitioner acknowledges that nobody knows what Petitioner told counsel at the time of trial. But again, given that even post-trial, in early 2001-2002, Petitioner was interviewed by two psychiatrists, and even during those interviews, Petitioner was portraying his childhood as relatively decent. Dr. Romanoff stated in his report that it might appear that Petitioner had presented a sanitized account of his childhood, so the most reasonable inference is that even Petitioner himself was telling his attorney that his childhood was not what counsel should have continued further investigation into. The last point I'd like to note is just the standard, which I'm sure this court is already aware, that to satisfy 2254D, Petitioner must show that all reasonable jurists would disagree with the state court's conclusion, and Petitioner simply cannot show that. Under a double-deference standard, to show strickling prejudice, and on top of that, that the state court's decision was unreasonable is an incredibly high standard to surmount, and he has not done so here. I would like to turn to Claim 23, the Instructional Claim. As Judge Clifton noted, there is no clearly established Supreme Court precedent that requires that a jury be instructed that it can consider sympathy for a defendant's family. And a few points to note there, it must be clearly established Supreme Court precedent. The cases that Mr. Walsh cites do in some instances tiptoe or address in an indirect manner certain aspects of the family sympathy defense, but in none of those cases does the Supreme Court say in no uncertain terms that a jury must be so instructed. Let's stop here. I understand the distinction you made with regard to instruction, but let's look at the family sympathy defense in general. Would you agree that the Supreme Court has acknowledged the existence, and indeed maybe itself has recognized that defense as one that may be pursued in mitigation? Yes, that would be in politbypinholster. And so if family sympathy is an acceptable defense, how would the jury here have understood that to be the case, particularly in light of the prosecutor's comments? The Supreme Court has never held that the jury must be instructed on this point, but that does not mean that other instructions cannot convey the same point. So as the State Court noted, there were several instructions given here that the jury couldn't consider anything in mitigation. Suppose the jury had been instructed, you may not consider sympathy for the family. Would that have run afoul of Supreme Court decisions? I am not aware of a Supreme Court case that says that. That didn't happen in this case. The argument would presumably have to be built on something like Cullen, which you had noted did recognize the existence of that defense, even though that wasn't a determinative legal point in the Cullen decision. Indeed, in Cullen, the court denied relief. But it inches in that direction, and that's what gives me some pause here. If the prosecutor hadn't said anything, then the instructions, you may consider anything in mitigation, would have, I'm afraid, more force than they would have had here, where the prosecutor says without contradiction, family sympathy is off the table.  Isn't that troubling? No, not in light of the other instructions given, which also include the instruction that the jury can and should disregard conflicts in the law that the attorneys make during argument. That to the extent there is any conflict with what the trial court instructs them, that they need to follow the laws given by the trial court. So the instructions, additionally, that were given to the jury here said that you could consider anything in mitigation, that the list provided in the instructions was not exhaustive. So to the extent the two are conflicting, the jury had to, and we presume that they did follow the instructions, and they could have considered family sympathy. But there's no Supreme Court case saying that they have to be told that they could. Petitioner's counsel suggested that defense trial counsel felt inhibited and as a result didn't respond to the prosecutor's comment to make an affirmative argument in support of family sympathy. Do you have anything you can point to in the record with regard to whether there was a basis for defense counsel to feel inhibited in that fashion? No, Your Honor, I don't have anything specific in the record, but again, I think that, I go back to the instruction that the court, that the court's statement of law is, whether or not defense counsel made some type of rebuttal in his closing argument to what the DA said, the jury is still instructed that, that they can disregard the DA's statement of the law on family sympathy. Do we make, if anything, of the fact that the case was tried and who matters was still the law on family sympathy, the fact that pain hasn't been decided, therefore the prosecutor can't make a decision either way? I'm sorry, Your Honor, I can't hear anything. It seems to be cutting out. Okay. Do we make anything of the fact that in that argument, the prosecutor argued that sympathy couldn't be given to either the defendant's family or to the victim, because the case was tried under the old, rather than under Pain v. Tennessee. There was a temporary period where victim impact testimony was out, and this case was tried in that window, wasn't it, or am I wrong on that? This case was tried in 1988? I think that's right. Because I'm looking at the prosecutor's statement. He says sympathy for the defendant means exactly that. It does not mean sympathy for his family. It does not mean sympathy for the victim, the victim's family. When the California Supreme Court quotes this, they note that it was decided for pain. So I'm wondering, how does that factor into our analysis that that's how the case was decided? That the prosecutor argued that it could not consider sympathy for the defendant's family, but it could for the victim? No, the prosecutor said they couldn't consider either because it was pre-Pain v. Tennessee when the case was tried. Okay. I think, if anything, that levels the playing field more so, because the jury has been instructed that it can consider sympathy for neither. And at least as to the defendant, that comports with Supreme Court precedent, because the jury is required to render a penalty sentence based solely on the individualized assessment of the defendant's record and the nature of the crime. It's not based upon his family's sympathy for others. If there are no further questions, does the bench have questions about the other claims? It appears not, counsel. Are you done? Yes. The respondent requests that the court affirm the district court's denial. Thank you. All right. Thank you. Rebuttal? Yes, Your Honor. Just on that last point, I just note that Pain v. Tennessee was decided in 1991, which was within the direct appeal. This case wasn't decided by the California Supreme Court, I believe, until 1998. Going back to the... But at the time of the trial, was it true that the prosecutor was forbidden to argue the victim impact? I don't know if you... I think that's correct. But at the time of the California Supreme Court's decision, it was not. I'll be a little late. I mean, he can't go back and make an argument during the trial just because the case law later got better. So the point raised by Judge Collins seems to be at the time of trial, it appeared that a victim impact statement wouldn't have been permitted. And he didn't make an attempt to make that argument. Maybe Mr. Walsh... Can I let Mr. Walsh respond since this was his argument? Well, he didn't reserve any time for rebuttal. No. Well, in any case, I think that the idea of pain was before the California Supreme Court, and that's the decision we're talking about. I just wanted to say one more thing in my last seconds about childhood trauma. I think there can be evidence of childhood trauma without evidence of direct abuse. And the jury in mitigation, a mitigation specialist, not a criminal investigator, a mitigation specialist, in between trying to ferret out the social backwards so that the jury can look and think what it was before. I've never done that. All right. Thank you, counsel. Thank you to all counsel. The case that's argued is submitted for decision by the court, and we are adjourned. This court for this session stands adjourned.
judges: Rawlinson, Clifton, Collins